IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| JESSICA C. WARD, | : | |
| Plaintiff, | : | |
| v. | : | No. 5:13-cv-262 (MTT) (CHW) |
| CAROLYN W. COLVIN, | : | Social Security Appeal |
| Acting Commissioner of Social Security, | : | |
| Defendant. | : | |

### REPORT AND RECOMMENDATION

This is a review of a final decision of the Commissioner of Social Security denying Plaintiff Jessica C. Ward's application for benefits. In accordance with the analysis below, it is **RECOMMENDED** that the Commissioner's decision be **AFFIRMED**.

### BACKGROUND

Plaintiff, who was born in July 1981, applied for Title II and Title XVI benefits in October 2009. (Pl.'s Br., Doc. 15, pp. 3-4). Plaintiff's alleged initial onset date is November 1, 2006, and Plaintiff claims that she is disabled due to, among other things, "psychiatric problems that produce[] symptoms such as mood swings, anxiety, paranoia, and auditory hallucinations." (*Id.*). Specifically, Plaintiff claimed, at her administrative hearing, that she has been diagnosed with "bipolar [disorder,] schizoaffective [disorder] and borderline personality disorder." (R. 73). These impairments, Plaintiff claims, limit Plaintiff's ability to interact with coworkers and with the general public. (R. 61).

Plaintiff previously worked as an in-home caretaker, a cashier, a "cook and dietary aide," and a deli worker. (R. 65-74). Most recently, from the end of 2010 to early 2011, Plaintiff

1

worked as an in-home caretaker for two clients for about six hours a week. (R. 65-68). One of Plaintiff's clients was her stepfather, with whom she lived in Visalia, California. (*Id.*). In 2011, Plaintiff became pregnant and moved to Macon, Georgia to be with her mother, who offered to help care for the child. (R. 60).

Regarding the part-time nature of most of her past work, Plaintiff stated, at her administrative hearing:

> [M]ost recently it was because I chose to work part time. And before, it was because that was what . . . was available. But when I had the option to become full time, I didn't do it.
>
> . . .
>
> I – just too much for me to handle. It was just, like, too tired, too stressful. I'd get overwhelmed and I just didn't – wasn't handling it. I was barely handling part-time.

(R. 71)

Plaintiff's application was denied initially and on reconsideration, and a reviewing administrative law judge ("ALJ") determined that Plaintiff was not disabled on May 25, 2012. (R. 32-47). The Appeals Council denied review in Plaintiff's case on March 4, 2013, and Plaintiff now seeks review before this Court under "sentence four" of 42 U.S.C. § 405(g). *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253 (11th Cir. 2007).

## STANDARD OF REVIEW

District courts have a limited role in reviewing claims brought under the Social Security Act. Review of the Commissioner's decision is restricted to a determination of whether the decision is supported by substantial evidence and whether the correct legal standards were applied. *Walker v. Bowen*, 826 F.2d 996, 1000 (11th Cir. 1987). Substantial evidence is defined as more than a scintilla and means such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Consequently, a court's role in reviewing claims brought under the Social Security Act is quite narrow.

District courts must defer to the Commissioner's factual findings. Courts may not decide facts, re-weigh evidence, nor substitute their judgment for that of the Commissioner. *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). Credibility determinations are left to the Commissioner and not to the courts. *Carnes v. Sullivan*, 936 F.2d 1215, 1219 (11th Cir. 1991). It is also up to the Commissioner and not to the courts to resolve conflicts in the evidence. *Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986). *See also Graham v. Bowen*, 790 F.2d 1572, 1575 (11th Cir. 1986). Courts must scrutinize the entire administrative record to determine the reasonableness of the Commissioner's factual findings. *Bloodsworth*, 703 F.2d at 1239. However, even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if it is supported by substantial evidence. *Id.*

The Commissioner's findings of law are given less deference. Courts must determine if the Commissioner applied the proper standards in reaching a decision. *Harrell v. Harris*, 610 F.2d 355, 359 (5th Cir. 1980). Courts must therefore consider any questions of law *de novo*, and "no . . . presumption of validity attaches to the [Commissioner's] conclusions of law, including determinations of the proper standards to be applied in reviewing claims." *Wiggins v. Schweiker*, 679 F.2d 1387, 1389 (11th Cir. 1982). The Commissioner's failure to apply the correct legal standards or to provide a sufficient factual basis for the court to determine that the correct legal standards have been followed is grounds for reversal. *Id.*

## EVALUATION OF DISABILITY

Persons are "disabled" for the purposes of receiving benefits under the Social Security Act if they are unable to engage in any substantial gainful activity due to a medically determinable physical or mental impairment which is expected to result in death or which has lasted or is expected to last for a continuous period of at least twelve months. 42 U.S.C. § 423(d)(1)(A).

When evaluating a claimant's disability, the Commissioner follows a five-step "sequential evaluation procedure." 20 C.F.R. § 404.1520(a)(4)(i)-(v). At step one, the Commissioner determines whether the claimant currently engages in substantial gainful activity. At step two, the Commissioner considers the medical severity of the claimant's impairments. Next, at step three, the Commissioner determines whether the severity of the claimant's impairments (i) meet or equal the severity of one or more of the impairments specified in the listing of impairments; and (ii) meet the duration requirement. If so, the sequential evaluation procedure stops and the claimant is declared "disabled." If not, the Commissioner assesses the claimant's residual functional capacity, ("RFC"), which is defined as "the most you can still do despite your limitations." 20 C.F.R. § 404.1545(a)(1). The Commissioner then proceeds to step four where, based on her RFC assessment, she evaluates the claimant's ability to return to past relevant work despite his or her medically-determinable impairments. Finally, at step five, the Commissioner determines whether there are a sufficient number of jobs in the national economy that the claimant can perform in light of his or her RFC, age, education, and work experience.

## ANALYSIS

Plaintiff raises two grounds for relief, neither of which warrants a reversal of the decision below. First, Plaintiff argues that the ALJ erred in finding that Plaintiff's low Global Assessment

4

of Functioning ("GAF") scores were exacerbated by drug use. Second, Plaintiff argues that the ALJ erred in discounting third-party function reports completed by Ms. Nancy Hampton, Plaintiff's mother. As discussed below, the ALJ committed a harmless error in evaluating Plaintiff's GAF scores, and the ALJ's credibility determination regarding Ms. Hampton's functional reports is reasonable, given the inconsistencies in those reports. As a result, the Court should affirm.

## DISABILITY EVALUATION IN PLAINTIFF'S CASE

Following the five-step sequential evaluation procedure, the reviewing ALJ made the following determinations in Plaintiff's case. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since at least November 1, 2006, her alleged onset date. (R. 34). At step two, the ALJ found that Plaintiff had the following severe impairments: "schizoaffective disorder, depressive type; polysubstance abuse; obesity; bipolar disorder; borderline personality disorder; asthma; and, degenerative disc disease, lumber spine." (R. 35). The ALJ also noted that Plaintiff suffered from hypertension, but that it was not severe. (*Id.*).

At step three, the ALJ found that Plaintiff's impairments did not meet or equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*). Therefore, the ALJ assessed Plaintiff's RFC and found that Plaintiff could perform:

> light work . . . with exceptions. The claimant had the capacity to tolerate up to frequent exposure to pulmonary irritants such as odors, fumes, dusts and gases, and poorly ventilated areas. She could frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. The claimant had the capacity to use ladders, ropes, and scaffolds occasionally. She required simple routine work consistent with a specific vocational preparation of 1 or 2. The claimant may have occasional interaction with co-workers, supervisors, and the general public.

(R. 37)

Based on this RFC finding, the ALJ found, at step four, that Plaintiff could not perform any of her past relevant work. (R. 45). At step five, however, the ALJ determined that Plaintiff could work as a "Garment bagger," "Marker II," or "Assembler II." (R. 46). Therefore, the ALJ determined that Plaintiff was "not disabled" under the Social Security Act.

## PLAINTIFF'S GAF SCORES

Plaintiff first argues that the ALJ erred in discounting her low GAF scores[1] due to drug use. (Pl.'s Br., Doc. 15, pp.11-14; Reply, Doc. 18, pp. 2-5). The record in this case contains a large number of GAF scores, ranging from 35 on the low end, (R. 829, 885, 882), to 65 on the high end, (R. 596). (R. 576, 598, 600, 716, 728, 752, 777, 788, 824, 829, 859, 865, 874, 882, 885, 893, 898, 908, 919). A score of 65 indicates "Some mild symptoms" or "some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well," whereas a score of 35 indicates "Some impairment in reality testing or communication," or "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." DSM-IV. Although the Commissioner does not endorse the GAF scale and has indicated that GAF scores have "no direct correlation to the severity requirements of the mental disorders listings," *See Wind v. Barnhart*, 133 Fed. App'x 684, 692 n.5 (11th Cir. 2005) (citing 65 Fed. Reg. 50746), Plaintiff nonetheless argues that (1) her low GAF scores show that she is disabled, and that (2) the ALJ erred in discounting these low scores on account of Plaintiff's history of substance abuse.

There is no question, here, that Plaintiff has a history of substance abuse. The record shows, and Plaintiff confirmed at her administrative hearing, (R. 60, 80), that she:

---

[1] *See, e.g.*, *McCloud v. Barnhart*, 166 Fed App'x 410, 412 (11th Cir. 2006) ("The Global Assessment of Functioning, or GAF Scale, is a numeric scale that mental health physicians and doctors use to rate the occupational, psychological, and social functioning of adults.").

- Began using alcohol and marijuana at the age of 13 or 14, (R. 750, 773, 862);

- "used meth heavily in her late teens and developed schizophrenic symptoms," (R. 750, 773);

- Claims to have been "off everything" since age 22 or 23, except for "a little bit of alcohol and a small amount of cannabis on special occasions," the last such occasion being either July 31, 2009, (R. 750, 773), or at some point in 2010, (R. 862, 840); and

- Tested "Negative" for marijuana, amphetamines, barbiturates, and cocaine in November 2011, (R. 955);

These records, and Plaintiff's history of substance abuse in general, are not at issue in this case. Rather, what is at issue is the chronology of Plaintiff's substance abuse. In discounting Plaintiff's low GAF scores, the ALJ stated:

> The record does contain River Edge staff's global assessment of functioning scores of 35-55, suggesting major impairment to only moderate symptoms, but at the time of these assessments, the claimant was using cocaine . . . .

(R. 43)

The River Edge records referred to by the ALJ date from 2011. (Exs. B21F, B22F). Elsewhere in her opinion, the ALJ stated: "Psychiatric treatment notes showed the claimant stopped using cocaine and amphetamine in November 2011." (*Id.*).

As the Commissioner acknowledges, the ALJ's findings regarding the chronology of Plaintiff's substance abuse are not supported by the record. (Resp., Doc. 16, p. 8). Rather, all of the evidence in the record suggests that Plaintiff did, indeed, stop using methamphetamine and cocaine in the early-to-mid 2000s, as she claims.

Despite the ALJ's error in chronology, a remand of Plaintiff's case is not warranted because the ALJ's error was harmless. *See, e.g.*, *Caldwell v. Barnhart*, 261 Fed App'x 188, 189

(11th Cir. 2008) (citing *Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983)). To put it another way, although the ALJ did err in finding that Plaintiff's continued cocaine use resulted in lower GAF scores, substantial evidence still supports the ALJ's determination that the GAF scores of 60-65 were "more indicative of [Plaintiff's] longitudinal functioning." (R. 43).

Nearly every mental functional evaluation in the record indicates that Plaintiff was consistently functioning at a relatively high level after her alleged onset date of November 1, 2006. From May to August 2007, for example, Plaintiff made "Significant Progress" at River's Edge, and it was noted that Plaintiff had only "Mild Impairments" and only minor to mild co-morbidity. (R. 545-547). In May 2008, Dr. Larmia Robbins-Brinson completed a mental status evaluation and determined Plaintiff had the "ability to sustain focused attention [that] would permit the timely completion of assigned tasks and [the maintenance of] production norms." (R. 607-10). Dr. Brinson also noted that Plaintiff "would not decompensate under stressful conditions." (*Id.*). Records from the Andrews Center dating from August and September 2009 show that Plaintiff had only "MILD" or "MODERATE" employment problems. (R. 682, 687, 700). A mental RFC assessment completed by Dr. E. Murmillo in January 2010 indicated that Plaintiff was only "moderately limited" in her ability to "understand and remember detailed instructions" and to "carry out detailed instructions." (R. 724-26). In all other respects, Dr. Murmillo found that Plaintiff was "not significantly limited." (*Id.*). A September 2011 intake mental status evaluation from River Edge indicated that Plaintiff had only mild functional impairments. (R. 853). Finally, River Edge records dating from November 2011 indicate that Plaintiff's low GAF score of 35 was caused, at least in part, by "problems with[]new born at home." (R. 829). These records, all of which were discussed at-length by the ALJ in her opinion, (R. 40-45), and very few of which were discussed by Plaintiff in her briefs to the Court,

8

constitute substantial evidence in support of the ALJ's determination that a GAF score of 60 to 65 was more representative of Plaintiff's actual level of functioning, notwithstanding the ALJ's error in chronology.

### MS. NANCY HAMPTON'S THIRD-PARTY FUNCTION REPORTS

Plaintiff second argues that the record does not support the ALJ's stated basis for assigning only "little weight" to two third-party function reports completed by Ms. Nancy Hampton, Plaintiff's mother, who also testified at Plaintiff's administrative hearing. (Pl.'s Br., Doc. 15, p. 14; R. 84-95). The relevant portion of the ALJ's opinion reads:

> I gave little weight to Ms. Hampton's report that the claimant required reminders and assistance taking her medications, had difficulty with concentration, following instructions, and getting along with others because she inconsistently indicated the claimant's symptoms diminished when compliant with her psychotropic medications. She further indicated the claimant had the capacity to prepare meals, had no problems with personal care needs, cleaned, washed laundry, drove, went out alone, paid bills, counted change, and talked on the phone.

(R. 44)

As the Commissioner notes, (Resp., Doc. 16, p. 10), the ALJ's decision to assign only "little weight" to Ms. Hampton's reports was based on inconsistencies in those reports. Ms. Hampton stated that Plaintiff needed reminders to get out of bed, (R. 331), to shower, (R. 387), and to take her medicine, (R. 331, 387), but Ms. Hampton also noted that Plaintiff could prepare her own meals, (R. 387), do her own laundry, (R. 387), and drive to stores and medical appointments, if provided with access to a vehicle. (R. 332). Ms. Hampton also noted that Plaintiff was able to independently care for herself with "no problem." (R. 330, 386). Given these seemingly inconsistent facts, and given fact that "credibility determinations are for the

[Commissioner], not the courts," *Bloodsworth v. Heckler*, 703 F.2d 1233, 1242 (11th Cir. 1983), there is no basis for this Court to conclude that the ALJ's decision to discount Ms. Hampton's third-party function reports was unreasonable.

## CONCLUSION

After a careful review of the record, it is **RECOMMENDED** that the Commissioner's decision be **AFFIRMED**. Pursuant to 28 U.S.C. § 636(b)(1), the parties may serve and file written objections to this Recommendation with the District Judge to whom this case is assigned **WITHIN FOURTEEN (14) DAYS** after being served with a copy thereof.

**SO RECOMMENDED**, this 25th day of July, 2014.

s/ Charles H. Weigle
Charles H. Weigle
United States Magistrate Judge
